The Honorable, the judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons who have any amount or form of business before the Honorable of the United States Court of Appeals for the 4th Circuit are admonished to draw an act and give their attention. For the Court is now sitting. God save the United States and this Honorable Court.  Under the procedure we have today, we have Judge Boxler out of state, across state lines. I think that's okay though. And you see him there and he'll participate as needed. Just be sensitive to the fact that it's harder to interrupt a little statement of something when you're on television. We'll hear from you, Mr. Bannis. May it please the Court. My name is Brad Bannis and I represent the petitioner, Mr. Riaz Mahmood. This Court should grant this petition because asylee adjustment does not terminate an underlying grant of asylum. And therefore, my client cannot be removed unless and until the respondents terminate his prior grant of asylum. And for that reason, this Court should remand this case back to the immigration judge for further proceedings consistent with that opinion. Your Honor, this case starts and finishes with the asylum statute codified at 8 U.S.C. 1158C. Walking through that statute. Well, I think you ought to start out with a little bit of a broader agenda or you just end up not addressing the issue. The issue is whether a person who voluntarily seeks to change his status from asylee to some other status under the Act, whether he still retains the benefits of being an asylee at that point. 1159 has the procedure by which you can change your status from asylee to permanent resident. And if you're a permanent resident, you still get the benefits of an asylee. And 1158 regulates what the Attorney General can do. He grants asylum and he can only take that away by that procedure. But 1159 does have a procedure where a person can adjust his status to that of a personal representative. The question, I guess, is once he has changed his status to that, shouldn't we just follow the rules that apply to his new status? Well, and, Your Honor, I agree with most of what you said. 8 U.S.C. Section 1159B does control adjustment of status for asylees. However, adjustment, that term in and of itself, does not eliminate any prior rights. What do you think adjustment means in the Act? Well, Your Honor, I do think it is a change of status. As the Second Circuit says, change of status. That's what adjust means. I don't disagree with that, Your Honor. However, a change of status does not necessarily imply, as the government argues, an elimination of rights. In fact, in most change of statuses, from that of a nonimmigrant to that of a permanent resident, we see it as an upgrade in status. It's not an elimination. It may be. You have to look at each status as the Act defines it. But if the Act says you can adjust your status voluntarily from status A to status B, that means you're now in status B, and you look at the Act to see how it treats status B. And your argument is that when you change from A to B, you're not changing from A to B. You're keeping A and adding B so that he has two statuses, so to speak. And I don't know if that's a fair reading of 1159, but you can argue that. Well, Your Honor, I would just point out that, first, I don't think the Court should read 1159 in a vacuum. It has to be read in context with 1157, 1158, and 1159. 1158 doesn't speak in terms of statuses, Your Honor. It speaks in terms of a grant of asylum. And that terminology certainly can go beyond what particular status an alien is in. If an alien comes in. Well, what it does, it regulates what the Attorney General does. And the Attorney General has the discretion in A to grant asylum. And in B, if he's going to take it away, he has to follow a procedure. And so that all applies to persons who are asylum. Now the question arises, what happens if a person voluntarily applies for a new status and is granted it? That is, he's from asylum, asylee, to a personal, to a resident, permanent resident alien. And I think the real question is, does he have any rights as an asylee after he changes his status? Well, and, Your Honor, just to be clear, I think the only right we're really talking about here, Wright, is the right of non-refoulement. The right to not be returned to a place where he'll be persecuted. Well, that depends on what his status is. Well, and. If he's still an asylee, he's going to be governed by 1158. There's a prohibition against doing certain things. But if he's now a permanent resident, we have rules that apply to that, don't we? I don't disagree, Your Honor. Okay. However, I do think, and the regulations and even the BIA has recognized, that you can maintain certain aspects of the grant of asylum as well as permanent residency. I would point, Your Honor, to 8 CFR 1208.14G. It's a regulation that says if you apply for asylum and then you acquire permanent residency through a different avenue, let's say you get married while you're waiting for your asylum application and you get a green card through that, you can and the agency will still grant your asylum regardless of the fact that you are now a permanent resident. If a foreign national could not maintain both the right of non-refoulement as well as the panoply of rights associated with a green card holder, Your Honor, then that regulation would be completely unnecessary. So I guess your point is that an asylee's status, the fear of persecution that was the impetus for granting that status to begin with, doesn't change simply because of the change in status. It all depends on whether or not conditions in the home country have changed such that there's no longer a fear of being persecuted. Is that your point? Well, I think that once an alien is granted asylum, he's in a unique status, to use the court's words, and one that is afforded on account of international obligations as well as U.S. law. Is it a permanent status? It can be, Your Honor. Although the statute does say it is not permanent, there is no restriction. You can remain in asylum status in perpetuity. However, under the five grounds that Congress has identified for termination, if there's a change of circumstances in your home country such that your fear of past persecution or well-founded fear of future persecution abates significantly, then the Attorney General and the Attorney General only has the discretion to make an affirmative decision to go and terminate that asylum. And that's all very important because none of that's a part of the adjustment under 1159B. Let me ask you, I guess, a procedural question. Are we in a position to actually address the merits of this claim, or is it your position that the BIA's analysis remains incomplete in terms of they're not considering the grounds for termination in their purportedly precedential decision in CJH? Is it appropriate to simply send this back and let the BIA complete its analysis? I'll answer that question two ways, Judge. First, if you're talking about whether the BIA should do termination proceedings in the first place, I don't think so, Judge. I think it's got to go all the way back to the immigration judge, because that involves extensive fact-finding and burden-shifting analysis between both parties. If you're asking whether this Court should follow the Ali Court in the Fifth Circuit, its lead, and just send it back to the BIA to allow for an interpretation of 1159B, I don't think that's necessary because I think this case is resolved on Chevron Step 1. 1158C2 is clear. There are five ways that you can terminate and get rid of asylum status. None of those are adjustment of status. Well, then tell me what the Court and Ali got wrong. Your Honor, I think that they went out of their way to find an ambiguity in the language of adjust to. As Judge Niemeyer and I were just discussing, that's a change of status. Adjustment to is just a change of status. There's nothing ambiguous about that. And we can't read that statute in a vacuum. And I think it's appropriate under Chevron Step 1 to use a couple of canons of statutory interpretation, that being text and structure. If we look at the structure, we see 1158C2. Except 1158 only regulates what the Attorney General may do and must do. It doesn't – what it says, if the Attorney General is going to withdraw the asylum that he's granted, he has to follow a procedure. And the subject of both A and B is the Attorney General. When you get to 1159, you're talking about the alien. And it says the alien can change his status from that of asylee to that of permanent resident. And it clearly seems that it suggests change from A to B, which means now he has a new status.  And, again, I would point you to the analysis in Ali. I read Ali. But Ali sort of suggested that what regulates the Attorney General precludes the alien from voluntarily changing his status. 1159 allows the alien to change his status on his own application. 1158 regulates what the Attorney General can do and the rights that the alien has if he is an asylee. He can't lose his status as an asylee from the Attorney General unless the Attorney General does A, B, and C. But when you go to 1159, it gives the authority of the – or the opening for the asylee to become a permanent resident and ultimately become a citizen, which is a real benefit. I completely agree, Your Honor. But I would say that 1158C protects the rights of anyone at any point who's been given a grant of asylum. And that grant of asylum provides the alien with one additional right, and that's the right of non-refoulement. Now, Your Honor, I would also point out that an asylee who goes through this process is also burdened by his prior status as an asylee. The government's brief only brings up the benefits it brings. But if you are an asylee, you adjust to a permanent resident, and you want to travel internationally, you still have to petition for travel authorization because you cannot rely on the passport of your home country. Otherwise, you open yourself up to termination under 1158C2. And so not only do they carry the benefits of non-refoulement, but they carry the detriments as well. They are a different kind of permanent resident under the Immigration Code until, Your Honor, they acquire citizenship. But I would argue if they naturalized and for some reason later down the road they were denaturalized, ordered removed, their grant of asylum would still have to be terminated. And I don't think we're suggesting a significant administrative burden on the Immigration Court here. This is one more step that can be done any time during the removal proceedings. It can be done during an individual merits hearing. A lot of the removal grounds coincide with a lot of the grounds for termination. And so I don't think it's an administrative burden. Well, what does 1159 mean when it says to change the status from A to B? It says to the status of a permanent resident, which sort of suggests an abandonment of the status of asylee, which means you're giving up any benefits you had as an asylee. Your Honor, I would suggest that it's an upgrade in status. It's an additional sticks in your bundle of rice. It doesn't say additional, it says to. That's right. It's adjustment from one status laterally to another. And that permanent residency, he doesn't have to go back and get work authorization every year, which is what you have to do as an asylee. He, let's see, can petition for relatives in a different way than an asylee can. And so there are certain benefits he upgrades, but the addition of benefits does not imply necessarily the negation of the prior status. And I think, again, this is a unique case under the Immigration and Nationality Act. An asylee is a protected status for lots of different reasons. I think probably because it derives from international law and then the Refugee Act, finally. Counsel, you said that this wouldn't be a huge burden on the government. I guess, and maybe this is, we should still dot our I's and cross our T's. It seems to me that the inevitable, that the result here is inevitable, even if we remand and allow the Attorney General to exercise his discretion. So aren't we engaging in an exercise of futility here? Your Honor, I'm not going to concede that it's inevitable, but I do think that sending it back and requiring the government to bear that burden. Again, it's a burden-shifting analysis. It could change the removal proceedings drastically. In addition, I would point to the Qureshi decision out of the Fifth Circuit from a few years back that identifies. If your asylum is terminated, the first thing you can do in removal proceedings is apply for asylum. Here, Mr. Mahmoud had to try to readjust his asylum status, which we don't challenge here, because it wasn't terminated. Had they terminated it, he could have then filed a new asylum application and gone down that route as well, Your Honor. So there's a lot of things that could happen in front of the immigration judge. And so I don't think it's an exercise in futility, Your Honor, at all. Now, you may say, you know, my client's claim to asylum might be weak because it's from 20 years ago. But we don't know that. And there's no facts in the record to say that. So I do not think it's an exercise in futility. Because, again, the paths, the various paths once we go back are very disparate. But, again, I just want to go back. 1159B is there, and it does voluntarily allow an asylee to voluntarily apply for permanent residency. But it can't be read in a vacuum. We have to look at 1158C2. That's the only statute that says how a grant of asylum can be dismissed, be terminated, be eradicated. Adjustment of status is not that word. Terminated by the Attorney General. Terminated by the Attorney General. That's right, Your Honor. That's the subject. That's the only person regulated. And so the question is, if that's the only way that the Attorney General can terminate asylum, what can the alien waive or relinquish his status as asylee by making an application to become a permanent resident? And there are reasons he might want to do that. Because 1159 does talk about either or. It talks about a change from one status to the other. Now, that's a voluntary status. That's not terminating his status as an asylee. It's changing it on his application. There's a lot of differences in there. May I answer, Your Honor? Of course. Thank you. I would answer that in two ways. First, Your Honor keeps pointing out that it's the Attorney General that has the unique congressional authority to somehow get rid of the rights associated with asylum. To terminate the status of asylee, the Attorney General is regulated by 1158. And I would just point out that 1159 allows both the Attorney General and DHS to grant permanent residency. DHS lacks the authority to, lacks congressional authority for good reasons as explained in the Jarre case or the Ninth Circuit, to take away someone's grant of asylum. And so 1159B structurally does not allow for termination in every circumstance. The other way I would answer that, Your Honor, is that I agree that 1158C regulates the Attorney General and describes its behavior. But it also gives him a duty and provides the alien with the corollary right. And that's the right to keep his asylum status until terminated. All right. Well, you have five minutes on rebuttal. Thank you, Your Honor. Ms. Walters. Good morning, Your Honors. May it please the Court, Tiffany Walters, for Respondent of the United States Attorney General. Mahmoud voluntarily chose to adjust his status from asylee to lawful permanent resident and to enjoy the privileges unique in lawful permanent resident status. As a result, he's subject to removal just like every other lawful permanent resident because he procured immigration benefits by materially misrepresenting his use of Pakistani passports in his return to Pakistan. The Court need not remand the case for the formality of asylum termination proceedings because Mahmoud's status changed from asylee to lawful permanent resident. He's no longer an asylee, and asylum termination proceedings do not apply. Well, he may no longer be an asylee if we agree with you, but have the conditions regarding his persecution changed such that he's still subject to being persecuted if he's returned? That issue is not litigated in the proceedings below because he didn't apply for asylum in the proceedings before. He could, as a permanent resident, apply for asylum. Absolutely. 1158A1 allows any alien to apply for asylum. So in removal proceedings, regardless of what had happened before with his status, he was in a position where he could have applied anew for asylum withholding of removal and protection under the Convention Against Torture. This case is not about whether or not an alien who has a well-founded fear of persecution is going to be removed to their home country. In that situation, there are avenues to provide protection for that alien. This is really just about who bears the burden of that. Under Petitioner's argument, an individual who is granted asylum 20 years prior is permanently presumed to be an asylee, regardless of whether he engages in fraudulent conduct, criminal conduct, whether or not he voluntarily adjusts his status such that he doesn't have to ever make his case for asylum status. Instead, the government would have to come forward with evidence to show that he is no longer an asylee. In fact, when Mahmoud in this case adjusted his status from asylee to lawful permanent resident, he changed his status and he got the additional benefits of being a lawful permanent resident, which means that unlike an asylee, he is protected from removal to any country. Asylum only protects from removal to the country from which the alien has a fear of persecution. In addition to that, he has benefits in terms of reunification with his family, in terms of a path to naturalization, and when he enjoyed those, when he decided to voluntarily take on this new status and enjoy those benefits, he gave up the particular protections of asylee status, which would entitle him to termination proceedings. Well, he didn't totally give them up because if, Judge Diaz's question says, if the country had conditions presently that were, justify asylum, he could claim asylum again. Certainly. He certainly could. In the context of removal proceedings. Every resident, permanent resident who is subject to removal can make that claim, right? Absolutely. The question is just whether or not he would have to present evidence of his fear of persecution versus the government having to essentially disprove it down the line. Here, I believe the plain language of 1159B controls this case. There, as Judge Niemeyer mentioned earlier, the statute talks about the adjustment of an alien from one's to the status of lawful permanent residence. That concept of adjustment involves a change of one status to another status. The statute refers, uses the term to, to suggest that movement from one status to another status. Ms. Walters, I'll ask you the same question I asked Mr. Banais. What did the court not only get wrong when it suggested that there was an ambiguity in this scheme that required the BIA to do a little bit more work? The court in Ali focused, I think they conflated the concept of termination with adjustment. 208 concerns termination of asylum proceedings. When we're talking about the situation of an alien adjusting from asylee to lawful permanent resident, we're not talking about terminating the proceedings. We're not talking about finding that the alien is no longer eligible for asylum such that they lose that status. We're talking about a voluntary change in status, and we're looking at what the effect of adjustment was on that alien's rights and responsibilities. And the court in Ali focused on 208, and 208 does not make the language of 209 be ambiguous. The language of 209 is unambiguous in its own that the adjustment is a change from one status to another. So, I mean, you're suggesting that we should look at 209 in isolation. Why is that appropriate? Well, not in isolation, not that we can't look at 208, but here the language of 209B is clear. 208 simply doesn't address the situation where you have an adjustment. I mean, clearly, asylum status is subject to termination, and 208 governs that. But here the question is, what was the effect of the adjustment? Does the alien still possess the status of an asylee such that 208C applies and termination proceedings are required? The BIA's precedential decision in CJA seemed to focus on refugee status and talked a lot about that. Isn't that mixing apples and oranges? I think refugee status is the closest point of comparison we have. I mean, the legislative history suggests that Congress viewed refugees and asylees as similar, and the statute itself reflects that they have similar statuses. To attain asylum, an alien must demonstrate that they meet the statutory definition of a refugee. So both refugees and asylees have demonstrated that they suffered persecution or that they have a well-founded fear of future persecution. They're both, in applying for adjustment, they're both exempt from the same grounds of inadmissibility. They're both eligible for the same waiver of inadmissibility. The statute and legislative history all suggest that this is the closest point of comparison, and it's worth pointing out the disparate treatment that would result if the court reached a contrary conclusion regarding asylees from the way refugees are treated. Well, I don't know that we necessarily need to get there, but I guess the first question is whether or not we need to require the BIA to do something else, do something more. Do something more. Because the language of 209B is plain, this Court need not defer to the Board and can't address the language in the first instance. Even if the Court finds that the language is ambiguous and agrees with the Court in that regard, our position is that matter of CJH was a permissible exercise of the Board's interpretation of the statute. The Board looked at the case file that was on the books, one asylee case and the rest were refugee cases. They looked at the legislative history. They looked at the language of the statute, and they reached a conclusion that asylee status does not survive adjustment. That's a permissible reading of the statute, and it's entitled to deference. In Ali, the Court remanded without ever reaching the question of whether or not the Board's interpretation in matter of CJH was permissible. In Ali, the Court found that the Board had not yet exercised its Chevron deference or Chevron discretion, which is a little bit of a perplexing position because Ali relied on Ngozi. And in Ngozi, the Supreme Court found that the Board had not exercised its discretion to interpret the statute where the Board thought it was controlled by prior Supreme Court case law. This is not the situation in matter of CJH. The Board didn't indicate that it thought it was controlled by refugee case law, but it found that to be the most apt point of comparison and relied on it in reaching its conclusion. The Board even points out that it recognizes that there's differences in the statute between adjustment for refugees under 1159A and adjustment for asylees under 1159B. The Board recognized that, but still in interpreting the cases and the statute and the legislative history concluded that that was the most consistent and the most reasonable interpretation of the statute. Do you think that if the BIA had simply reached that conclusion without any analysis, a very little analysis, that a circuit court would be in a proper position to say, no, you need to show your work, that's not good enough? Chevron deference really focuses on the question of whether or not the interpretation is permissible. So the end result is what matters. The end result is what matters. No matter how the Board gets there. The focus is really is whether or not the interpretation is permissible. It's not whether or not the Court would do it differently in the first instance. What about if it consulted a Ouija board and got to that result? I think at that point you're looking at an impermissible interpretation because it's arbitrary. I mean, that's the language that Chevron uses. Is this an arbitrary interpretation? Well, I guess the question is how much work is enough, right? I think that's probably a question that would have to be worked out in another case. Here, regardless of where that line is, the Board's interpretation in a matter of CJH is enough. They referenced the relevant case law. They looked to refugee status. They recognized the differences and they determined that this was the appropriate way to interpret the case. They also looked at the plain language of the statute as well and cited the Ninth Circuit's decision in Robledo Pastora, which focused on adjustment under 1159B but also rejected the same argument that's raised here in a footnote. They said that termination proceedings are not a precondition to removal. And that's consistent with the position that the Sixth Circuit has also taken,  The Board's decision is consistent with that. So even if the statute was ambiguous, the Board's interpretation is reasonable. Anything further? Panel? All right. Okay. Thank you. Thank you, Ms. Walters. Mr. Banas? Is it correct that your client could have reinitiated an application for asylum as part of the removal proceedings? I believe so, Your Honor. Then why are we here? Why are we here? Your Honor, I was not the immigration attorney below. I'm not criticizing you. I just – is it all about the burden? I think it's our position and his attorney's position that he was an asylee, period. And so our avenue for relief was readjusting through the waiver in 1159C. And that's what the BIA's decision focused on and said, no, you can't do that. Under CJH, you can't readjust. And that's what CJH is holding is, whether an asylee can go into removal proceedings and try to readjust his status using the generous waiver in 1159C. Okay. You know, we get immigration cases, but I'm certainly no guru when it comes to this. So what's the difference between readjusting status and reapplying for status? Yes, Your Honor. I think because it was our position that he maintained asylum status to begin with, that there was nothing to really reapply for. Instead, he could show he had a good argument for the waiver under 1159C. And so instead of trying to reapply for asylum, he said, look, I'm an asylee. I can adjust under 1159B with this waiver. And so I want to readjust his status. That was his avenue for relief. What do you think it means if you change your status from asylee to a permanent resident? What do you think that means, to change to or convert to or to adjust to? The Second Circuit, you said adjust means change. But I think everybody seems to agree on that. So you change from asylee to permanent resident. What does it mean when you change that position? Doesn't it mean you have voluntarily relinquished your status as an asylee? I think it's an addition of rights, Your Honor. But you wouldn't say then change from A to B, if that's the interpretation. That has been sort of my problem with your position. And I'd have to look at all this more closely. But that's a pretty big hurdle to get over, that language under 1159. Your Honor, I think that our discussion today, at a minimum, and this is our argument in the alternative, of course, is that 1159 is ambiguous. Does adjustment to mean you are going from A to B, period, or does it mean it's A plus B? It doesn't say that. It's A to B. And your whole fear about continuing persecution is protected under the act that if, as a permanent resident, he now commits a crime or does something else by which he's removable, then he can assert asylum claim again based on current conditions. Twenty years ago may be different from today's conditions, and that can all be addressed that way. But to argue that he's still an asylee after he voluntarily made an application to change from asylee to permanent resident, I hear what you're saying, but I'm going to say the statute language doesn't say plus. It really says change to. And, your Honor, I don't think you can look at 1159B in a vacuum. I think that the step one of Chevron … I agree, but I thought the government made a pretty good point that if you go to 1158, you're talking about a different process, terminating a status as opposed to converting it. And the terminating a status by the Attorney General, there's a procedure. But converting it, the alien's given that opportunity. Your Honor, I think the practical effect is the same. And so if you interpret adjust to mean getting rid of those rights associated uniquely, unique rights associated with adjustment, or I mean asylum, such as non-refoulement, then that could constitute termination. That could constitute adjustment. That could constitute, you know, revocation. And that's the ambiguity in 1159B. What does adjustment do to those prior rights? And that's what the Ali court pointed out. Again, I think this case is decided by 1158, but Ali makes a very good point that it is an ambiguous. 1159B is ambiguous. It then goes through and dismantles CJH. And, Judge Diaz, I do think it matters what the reasoning for the BIA was in CJH because it's a basic principle of administrative law that if the decision below lacks reasoned decision making and it doesn't touch on the factors it must be touched on, it should be set aside. And I see my time is up, unless the Court has any other questions. Thanks very much. Thank you, Your Honor. We'll come down and greet counsel and then proceed on to the next case. Thank you.
judges: Paul V. Niemeyer, William B. Traxler, Jr., Albert Diaz